IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LUCY WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:03-CV-1097-WKW |
| | ) (WO) |
| LAMAR GLOVER, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

On November 10, 2003, Plaintiff Lucy Williams (hereafter "Williams") filed this action against Houston County Sheriff Lamar Glover (hereinafter "the Sheriff" or "Sheriff Glover") and others for relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*; the 1991 Civil Rights Act (Public Law 102-166) (§ 102); 42 U.S.C. § 1981, *et seq*; 42 U.S.C. § 1983; and 28 U.S.C. § 1331.  Williams requested injunctive relief, compensatory damages, costs of court and reasonable attorney fees.  On June 9, 2004, this Court entered a Memorandum Opinion and Order (Doc. # 36) dismissing Defendants Houston County Sheriff's Department and Houston County Commission, as well as Williams' claims of retaliation, Title VII disparate treatment claims against Sheriff Glover in his individual capacity, and the § 1983 equal protection violation against Sheriff Glover in his official capacity.  The remaining claims in this case are a Title VII disparate treatment claim against Sheriff Glover in his official capacity, a § 1983 equal protection claim against Sheriff Glover in his individual capacity for damages, and an equal protection claim against Sheriff Glover in his official capacity for prospective injunctive relief.  Before the Court is the Sheriff's Motion for Summary Judgment (Doc. # 49) filed on July 20, 2005.  For reasons to be

discussed, the Court finds that the motion is due to be GRANTED.

## I. FACTS

The facts contained in the parties' evidentiary submissions, viewed in a light most favorable to the non-movant, show the following:

Lucy Williams worked for the Houston County Sheriff's Department from 1977 to 2003. Hired as a Jail Matron, later promoted to Corrections Officer and then Senior Corrections Officer, she ultimately became the Jail Administrator in 1996. It was from this position that she resigned on April 19, 2003. For most of her tenure as Jail Administrator, Williams reported to Bill Land (hereinafter "Land"), Operations Commander for Sheriff Glover. Land reported directly to Sheriff Glover. On March 31, 2003, Sheriff Glover divided the supervisory position previously held exclusively by Land into two positions, with supervision of the jail removed from Land and awarded to Walter Bowers (hereinafter "Bowers") as Commander of Jail Operations. This was a newly-created position occupying the same level in the administrative hierarchy as Land, reporting directly to Sheriff Glover. When Bowers was hired, Williams began reporting to him instead of Land. Effectively, this personnel change created two Operations Commander positions instead of one. Previously, Land had overseen all operations of the Sheriff's Department, including the jail.

Land never had an office at the jail, but because Bowers' main responsibility was jail operations, Bowers' office was located at the jail. He was given Williams' office, and she was moved into an adjacent, smaller office. Bowers was also given a cell phone, a parking space, and a county car—the same equipment that was issued to Land. Williams' new office contained two bookcases, a desk, a chair, and filing cabinets. Bowers was assigned the main jail keys and computer, both of which had previously been assigned to Williams. In addition, Williams' "call

2

sign," or employee code, was changed from "38J1" to "38J3." A male Senior Corrections Officer had the call sign "38J2," and his call sign remained unchanged. These call signs are seen as designating the relative rank of an employee.

When Bowers was hired, Williams' job title and pay remained the same, but Williams was no longer to contact Sheriff Glover directly, and some of her job duties were assumed by her new supervisor. However, many of her other day-to-day duties concerning oversight of the jail and the corrections officers remained the same.

From April 2002 through March 2003, there were significant and recurring staff problems in the jail operation due to conflicts over the operation and staffing of the jail medical clinic. There were numerous complaints about the nursing staff and medical care for inmates, including a general lack of communication between working staff and other jail personnel, unqualified persons administering medical assistance and treatment, alleged preferential treatment by Sheriff Glover for some medical staff members, and complaints about a failure of certain medical staff to work their reported hours. Williams became significantly embroiled in the controversy, and communicated her concerns to Land, her then-supervisor, who in turn passed them along to Sheriff Glover.

Sheriff Glover contends that Williams participated in and encouraged an atmosphere of discord among the employees by making comments about preferential treatment received by Darla Speigner (hereinafter "Speigner"), the nurse practitioner in charge of the medical clinic. Williams denies any such encouragement and alleges that she merely reported the staff's concerns to Land. In either case, it is clear from the evidence presented that problems existed between jail employees and the nursing staff, and that Sheriff Glover was aware of the problems.

On February 20, 2003, Speigner wrote a letter to Williams urging her to request replacement

of one of the staff nurses. Williams replied to the letter on February 24, 2003, telling Speigner in part that she was "troubled" by the letter. That same day, Sheriff Glover, upset by Williams' response to Speigner, went to Williams' office. It is undisputed that there was a confrontation, but the parties dispute the words used by the Sheriff to Williams. Williams contends that the Sheriff yelled at her, saying that it was time for her to retire, and that he was going to replace her with a male because she was not getting along with Speigner. Sheriff Glover denies ever saying that he would replace Williams with a male.

Sheriff Glover had spoken with Bowers regarding his possible employment with the Department in the fall of 2002, months prior to the February 24, 2003 confrontation between Sheriff Glover and Williams. Sheriff Glover told Land on March 7, 2003 that he was going to hire Bowers as Commander of Jail Operations. On March 12, 2003, Sheriff Glover requested the Houston County Commission to approve the position of Jail Commander. Williams learned on March 18, 2003 that Bowers was being hired as Jail Commander. On March 24, 2003, Sheriff Glover introduced Bowers to the jail personnel, and Bowers commenced his duties on March 31, 2003. Williams resigned her position as jail administrator on April 18, 2003.

Williams filed a Complaint with this Court in November 2003. On July 20, 2005, Sheriff Glover filed a Motion for Summary Judgment (Doc. # 49). Williams filed a Response to Motion for Summary Judgment (Doc. # 56) on August 24, 2005, and Sheriff Glover filed a Reply (Doc. # 58) on September 8, 2005.

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties contest neither personal jurisdiction nor venue.

### III.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  The movant can meet this burden, in a case in which the ultimate burden of persuasion at trial  worked on the non-movant, either by submitting affirmative evidence negating an essential element of the non-movant's claim, or by demonstrating that the non-movant's evidence itself is insufficient to establish an essential element of his or her claim.  *Id.* at 317, 322-23.

The burden then shifts to the non-movant to set forth facts "beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  The evidence must be more than merely

culpable; to survive a motion for summary judgment, it must be significantly probative. *Early v. Champion Int'l., Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990).

On the other hand, the non-moving party need not present evidence in a form necessary for admission at trial. *Celotex*, 477 U.S. at 324. All evidence and justifiable inferences when drawn therefrom must be viewed in the light most favorable to the non-movant. *Early*, 907 F.2d 1077, 1080. The court is to refrain from deciding any material factual issues at this stage of the proceeding. *Anderson v. Liberty Lobby, Inc.*, at 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

Williams brings claims under both Title VII and 42 U.S.C. § 1983. In cases where § 1983 is employed as a remedy for the same conduct attacked under Title VII, "the elements of the two causes of action are the same." *Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995). Title VII provides that it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1983 prohibits "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law. 42 U.S.C. § 1983.

Williams claims that she was subjected to (1) either a demotion or failure to promote, and (2) constructive discharge. Because an essential element of both causes of action is adverse

employment action against the plaintiff, the Court will first address whether Williams has presented sufficient evidence on that element to survive summary judgment. "[T]he plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001) (citing *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999)). "The plaintiff must show that an adverse employment action was taken against him regardless of whether he is relying on direct evidence of discrimination or employing the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, for cases in which only circumstantial evidence is available." *Id.* at 1231 (citations omitted).

A.   Demotion

The Eleventh Circuit has held that "to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (citation omitted). The court explained:

> Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id.* at 1239-40 (emphasis in original). In *Stavropoulos v. Firestone*, 361 F.3d 610 (11th Cir. 2004),

the Eleventh Circuit gave further analysis of what constitutes an adverse employment action, albeit in the context of a Title VII anti-retaliation claim. To be considered an adverse employment action, there must either be (1) "an ultimate employment decision" resulting in (a) loss of job, or (b) lessening of pay, position or benefits, or (2) an action that "meet[s] some threshold level of substantiality." *Id.* at 617 (citation omitted). Whether this Court adopts the instructive language of *Davis* (objectively "serious and material change in the terms, conditions or privileges of employment"), *id.* at 1239-40, or the analysis of *Stavropoulos* just stated, Williams fails to establish (1) an objectively serious and material change in her terms, conditions or privileges of employment; (2) an ultimate employment decision; or (3) a totality of acts by Sheriff Glover which meet a threshold of substantiality. To prove that she was demoted, Williams has offered evidence to show the following: (1) her "call sign" was changed; (2) she moved into a smaller office; (3) she had to give up command of the jail keys and main computer; and (4) she had less authority to determine jail policy under Bowers than under Land. (Williams Aff. ¶ 56.) Williams claims she was humiliated and stripped of her dignity when Bowers was hired. Williams subjectively felt her position at the jail had suffered when Bowers began working there. Courts, however, do not consider such claims subjectively; the standard is an objective standard of reasonableness. *See Davis*, 245 F.3d at 1239-40.

In *Stavropoulos*, the court described two situations in which an adverse employment action was found to have taken place. 361 F.3d at 616-17. In one example, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), the court found that the plaintiff had established an adverse employment action "where she established that her employer had improperly listed her as a no-show on a day she was scheduled to have off, gave her written reprimands which resulted in a one-day

suspension, solicited comments on her performance from only those employees with negative things to say about her, failed to schedule her for work, threatened to shoot her in the head, and delayed authorizing medical treatment for an allergic reaction she was having." *Stavropoulos*, 361 F.3d at 616-17 (citing the *Wideman* court as holding that the totality of these acts met the standard for an adverse employment action, but declining to decide whether anything less than the totality would meet that standard). In another example, *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095 (11th Cir. 2001), the court found there was an adverse employment action "when, comparing the plaintiff to other employees of the same rank, the employer forced plaintiff to perform more menial tasks under less senior personnel; denied the plaintiff opportunities to earn several types of extra pay available to his co-workers; and forced plaintiff to take tests in order to maintain his paramedic pay, while not requiring his co-workers to take the tests." *Stavropoulos*, 361 F.3d at 616-17.

  Williams has presented no evidence that she was subject to any kind of threats or physical harm; she was not denied the opportunity to earn at the level she had previously; she was not forced to work under personnel less senior than her; and her job title and pay remained intact. (Glover Aff. ¶ 5; Williams Dep. at 46:11-14.) The fact that Williams was moved to a slightly smaller office (her old office was 13 feet by 14 feet; her new office was 10 feet by 14 feet) and that Bowers was given control of the main jail keys and computer were the result of a new position being created. (Bowers Aff. ¶ 12.) Previously, Land, as the sole Operations Commander, had not occupied an office at the jail. When Bowers' position as Commander of Jail Operations was created, some adjustments at the jail had to be made. One of those was to give the Commander of Jail Operations the larger office, and another was to ensure that he had control over the main operating systems at the jail. Sheriff Glover testified that he believed the jail was in need of more supervision and direction, and that is

why he added the position of Commander of Jail Operations. (Glover Dep. at 200:25-201:6.) He felt that Land was not adequately supervising the jail and so he installed Bowers in the newly-created position. (Glover Aff. ¶¶ 8-10.) While Williams may have had to share some of the control over the jail that had previously been hers alone, none of the personnel changes she encountered amounted to a demotion.

*Benefield v. Fulton County, Ga.*, 130 Fed. Appx. 308 (11th Cir. 2005) is an unpublished opinion with several factual markers the Court finds similar to those presented by Williams. In *Benefield*, the plaintiff alleged that she had suffered an adverse employment action because of her employer taking the following actions:

> (1) discontinuing her use of a take-home car, (2) taking away her pager, (3) transferring her staff and taking away her responsibilities as EMS coordinator, (4) denying her reimbursement for business-related cell phone calls, (5) denying her reimbursement for a work-related conference, (6) transferring her from the headquarters office to a fire station, (7) not giving her light duty after she re-injured her shoulder while moving during the transfer, (8) delaying her reclassification to captain, and (9) failing to immediately reimburse her for out-of-class pay.

*Id*. at 313. The court found that the plaintiff had not suffered an adverse employment action because she underwent a lateral job transfer that resulted in "changes in work assignments," and she "failed to show that the transfer resulted in a change in her rank or compensation." *Id*.

Like the plaintiff in *Benefield*, Williams has demonstrated only that her work assignments have shifted due to the addition of Bowers as Operations Commander; she has not shown, however, that her rank or compensation decreased. Williams' situation is not similar to those analyzed in *Stavropoulos* where the court found that there had been an adverse employment action. Applying a reasonable person standard, the Court finds that Williams did not suffer a serious and material change in the terms, conditions, or privileges of her employment. Sheriff Glover's Motion for

Summary Judgment as to Williams' claim of demotion, therefore, is due to be granted.

B.      *Failure to Promote*

When Williams heard that Sheriff Glover planned to create a new position, she indicated that she would like to apply for that position. (Williams Dep. at 157:7-9.) However, the fact that Sheriff Glover hired Bowers instead of Williams for the position is not subject to a Title VII claim. The position of Commander of Jail Operations falls under the category of the Sheriff's "personal staff," rather than a regular employee, and is not filled through the same type of merit-system process as other positions. (Glover Dep. at 100-01; Glover Supp. Aff.) When a position falls within the "personal staff" exemption, a plaintiff cannot bring a Title VII claim based on not being hired for that position. *See Teneyuca v. Bexar County*, 767 F.2d 148 (5th Cir. 1985); *see also* 42 U.S.C. § 2000e(f).[1] The Eleventh Circuit has described the concept of "personal staff" as one that "embodies the general and traditional proposition that positions of confidentiality, policy-making or acting and speaking before others on behalf of the chief are truly different from other kinds of employment." *Shahar v. Bowers*, 114 F.3d 1097, 1104 (11th Cir. 1997) (describing staff attorney as a member of the state attorney general's personal staff). The court has further elaborated on the concept by adopting a six-factor test to determine whether an employee is a member of an elected official's "personal staff":

---

[1] Title VII defines an "employee" as:
> an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office . . . .

42 U.S.C. § 2000e(f).

> (1) [W]hether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Laurie v. Ala. Ct. of Crim. App.*, 88 F. Supp. 2d 1334, 1338 (M. D. Ala. 2000).

Bowers meets the criteria to be considered a member of Sheriff Glover's personal staff because Sheriff Glover has sole and absolute authority to appoint someone to the position of Commander of Jail Operations, that person represents the Sheriff in the eyes of the public, and the Commander is the Sheriff's "alter ego" within the jail for supervisory and administrative purposes. (Glover Supp. Aff. ¶¶ 2-4.) Sheriff Glover has testified by affidavit that he and Bowers have a close working relationship built on trust and confidence, and that they communicate at least daily, often two or more times per day. (Glover Supp. Aff. ¶¶ 5-7.) According to the test established in *Laurie*, Bowers clearly meets the definition of a member of the Sheriff's personal staff. As a result, Williams does not have a valid Title VII claim against Sheriff Glover for failure to promote her to the position of Commander of Jail Operations. Therefore, she cannot establish that she suffered adverse employment action under Title VII for failure to promote, and the Sheriff's Motion for Summary Judgment as to this claim is due to be granted.

Williams has also alleged a § 1983 claim against Sheriff Glover for failure to promote. In order to establish a *prima facie* case of failure to promote,[2] Williams must show that: "(1) she is a

---

[2] Williams contends that she has presented direct evidence of discrimination in the form of Sheriff Glover's alleged comment, "I'm going to replace you with a male." However, the comment, if true, would only affect the analysis of Williams' claim that she suffered a demotion—that is, the claim that Bowers took her job, and she was

member of a protected class, (2) she was qualified and applied for the promotion, (3) she was rejected despite her qualifications, and (4) other equally or less qualified employees who were not members of the protected class were promoted." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Williams' claim fails because she cannot establish the second or fourth prongs of the prima facie case. She has not demonstrated that she was qualified for the position of Commander of Jail Operations, nor has she demonstrated that Bowers was equally or less qualified. Bowers has a more extensive education than Williams. He has a bachelor's degree in criminal justice and a master's degree in counseling and psychology; Williams has a high school diploma and completed part of the requirements for a two-year business degree. (Bowers Aff. ¶ 2; Williams Dep. at 13:3-13.) Bowers also has a more extensive work history in the field of criminal justice. He is a retired state trooper who had served as assistant post commander of a large post in Birmingham, as well as post commander in Dothan. Bowers also has experience working as a prison counselor at a state penitentiary and as a counselor at a youth detention facility. (Bowers Aff. ¶¶ 3-4.) Williams has not produced evidence that she worked in any criminal justice positions outside of her duties at the Houston County Jail. Additionally, because the position of Commander of Jail Operations requires such intimate interaction with the sheriff (see description under discussion of "personal staff," *supra*), an important job qualification is the ability to act as a trusted assistant and advisor to Sheriff Glover. Sheriff Glover has stated that he believed Williams was instrumental in fostering discord among jail employees due to her "personal feud" with Speigner. (Glover Aff. ¶ 8.) Sheriff Glover

---

demoted to a lower-ranking position—and the Court has determined that Williams did not suffer any adverse employment action that could be classified as a demotion. Her failure to promote claim is not implicated by Sheriff Glover's comments; therefore, the Court analyzes this claim under the *McDonnell Douglas* analysis, which first requires Williams to establish a *prima facie* case. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

has also stated that he did not believe Williams had the ability to be a strong leader and that he did not think she would have performed well in the position of Commander of Jail Operations. (Glover Aff. ¶ 14.)  Given the discrepancies in Williams' and Bowers' qualifications, the Court finds that Williams has not established that she was qualified for promotion to Commander of Jail Operations, nor has she demonstrated that Bowers' qualifications were equal to or less acceptable than hers. Sheriff Glover's Motion for Summary Judgment as to Williams' § 1983 claim of failure to promote is therefore due to be granted.

C.      *Constructive Discharge*

"The threshold for establishing constructive discharge . . . is quite high." *Hipp*, 252 F.3d at 1231.  In order to succeed on a constructive discharge claim, a plaintiff must demonstrate that working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)). "[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) (citations omitted). "The plaintiff's subjective feelings about her employer's actions are not considered; instead, the standard is whether a reasonable person in her position would be compelled to quit." *Id*.

Based on Williams' complaints that: (1) her "call sign" was changed; (2) she moved into a slightly smaller office; (3) she had to give up command of the jail keys and main computer; and (4) she had less authority to determine jail policy under Bowers than under Land, the Court cannot conclude that a reasonable person in similar circumstances would be compelled to quit.

In *Poole*, the Eleventh Circuit found that the conditions the plaintiff complained of were sufficient to rise to the level of constructive discharge. In that case, the employee was transferred to a different office, other employees were instructed not to speak to her, she was given only a chair to sit in but no desk, her belongings were placed in boxes on the floor beside her chair, and her new position carried with it no duties or responsibilities. *Poole*, 129 F.3d at 555. In other words, the plaintiff in *Poole* was forced to sit alone in a chair all day with no one to talk to and nothing to do.

The facts of the present case are clearly distinguishable. Williams was moved to a slightly smaller office, but was not denied basic office furniture or equipment. In addition, she retained nearly all of the same duties and responsibilities she had before Bowers was hired. Williams has complained that she no longer had direct access to Sheriff Glover after Bowers began working at the jail, but she has also admitted that, prior to Bowers being hired, Land was the intermediary between her and the Sheriff. (Williams Dep. at 34:5-16.) She has also complained that her "call sign" was changed, and that it appeared to others that she had moved from first in command at the jail to third in command. However, whatever embarrassment Williams may have felt because of this does not render her situation so intolerable that a reasonable person would feel compelled to resign.

In her pleadings and motions, and throughout her deposition testimony, Williams made clear that she believed she had been treated unfairly by Sheriff Glover because of her complaints about Speigner and the jail's medical clinic. Williams believed that the Sheriff showed favoritism toward Speigner and treated Williams unfavorably when it appeared that Williams was critical of Speigner. (Williams Dep. at 175:12-16; Williams Letter of Resignation.) While it is certainly possible that Williams' speculation is grounded in fact, the claim before this Court is not one of retaliation; in

15

fact, Williams' retaliation claim was dismissed at an earlier stage in this case.[3] The claims under consideration are strictly those involving discrimination on the basis of sex, and Williams has failed to show that she suffered any adverse employment action significant enough to be actionable under Title VII or § 1983.

## V.  CONCLUSION

Construing all facts presented in the light most favorable to Williams, the court finds that she has failed to demonstrate that a genuine issue of material fact exists with regard to her claim of discrimination on the basis of sex.

It is therefore hereby ORDERED that

1. The Defendant's Motion for Summary Judgment (Doc. # 49) is GRANTED.

2. The pretrial conference set for April 3, 2006 is CANCELLED.

3. The clerk is DIRECTED to remove this case from the May 15, 2006 trial docket.

A final judgment will be entered in accordance with this order.

DONE this the 30th day of March, 2006.

       /s/   W.  Keith Watkins
      UNITED STATES DISTRICT JUDGE

---

[3] *See* Doc. # 36 (June 9, 2004), finding that Williams' complaints about Glover's possible romantic involvement with Speigner were not statutorily protected activity within the meaning of Title VII.